FUNG DAI KIM AH LEONG *v.* LAU AH LEONG.

No. 1729.

APPEAL FROM CIRCUIT JUDGE FIRST CIRCUIT.
HON. C. F. PARSONS, JUDGE.

ARGUED MARCH 14, 1927.                    DECIDED MAY 6, 1927.

PERRY, C. J., BANKS, J., AND CIRCUIT JUDGE MASSEE
IN PLACE OF PARSONS, J., DISQUALIFIED.

MARRIAGE—*void*—*rights of putative wife in property jointly accumulated.*

> When a woman lives with a man in the belief. that she is lawfully married to him and by her labor or otherwise assists him in the accumulation of. property she is not, either at law or in equity, in the absence of express agreement, entitled, upon discovery that the marriage is illegal and void, to a share of the property so accumulated.

OPINION OF THE COURT BY BANKS, J.

The complainant brought a suit in equity against the respondent by which she seeks to establish her claim to a portion of the respondent's property. The circuit judge decided the case in favor of the respondent and entered

a decree dismissing the bill. From this decree the complainant appeals.

As we understand the bill and the contention of the complainant she bases her claim on two theories—one the alternative of the other. The first theory is that in 1887, at a time when the respondent was without means and was just entering upon a commercial career in Honolulu, she gave him $200 of her own money with the understanding and agreement that it was to be put into a mercantile business and that both of them would devote their time and energies to the upbuilding of the business and would share the profits and accumulations derived from it; that, through their united efforts expended during many years under this agreement, large and valuable assets have been accumulated which stand in the name of the respondent alone and that he refuses to grant her any interest in this property; that, to the end that she may have her just rights, the respondent should be declared to be a trustee for her benefit and should be required to account to her for her equitable proportion of the property in question. The second theory upon which she relies is that in 1884, when she was a young girl of seventeen and shortly after her arrival in the Hawaiian Islands from China, a marriage ceremony was performed between herself and the respondent at Kohala, on the Island of Hawaii, which she in good faith believed united them in lawful wedlock; that not long after this ceremony she and the respondent came to Honolulu where they continued to live together as husband and wife for upwards of thirty years and that during this period she gave birth to several children of which he was the father; that shortly after taking up their residence in Honolulu a small stock of merchandise was purchased towards which she contributed the sum of $200 and thereupon the re-

spondent began his mercantile career; that believing herself to be his lawful wife and having his prosperity and success at heart she for many years collaborated with him in building up his fortune, devoting her time and her energies to keeping the store in order, waiting on customers, delivering goods and performing the household duties; that in 1920 the supreme court of Hawaii in *Parke* v. *Parke*, 25 Haw. 397, decided that a statutory license was essential to a valid marriage in Hawaii and therefore the marriage between herself and the respondent for which no license had been issued was entirely void; that under these circumstances she has no legal standing as the wife of the respondent but, inasmuch as she assisted him in the accumulation of his wealth under the honest belief that she was his lawful wife, she, in equity and justice, should not be left remediless but should be awarded a share of the property she helped to accumulate.

When this case was formerly here on reserved questions it was the conclusion of the court that the first theory was sound in law. *Ah Leong* v. *Ah Leong*, 28 Haw. 581. Since then the case has been tried in the circuit court on its merits and the facts have been judicially ascertained. The circuit judge held that the evidence was insufficient to prove that the complainant contributed any money to the business in which the respondent was engaged and that it was also insufficient to prove that her contributions of labor and services were made under an agreement, express or implied, that she and the respondent were to be joint owners of the assets of the business and its profits and accumulations. While we are not bound by this finding it is nevertheless entitled to great weight and should not be overturned unless we are convinced that it was erroneous. The evidence does not so convince us. The only evidence

of an express agreement is that furnished by the testimony of the complainant herself. It is brief and is as follows: "Q State whether or not you had any understanding, arrangement or agreement with Ah Leong, or did Ah Leong say anything to you as to the business or ownership of the business? A Yes, he said it belonged to us, and the name of the business was 'Wing Hung Kee.' Q What does the word, 'Wing' mean? A That means 'eternal,' 'permanent.' Q What does 'Hung' mean? A That is my surname. Q Family name? A Surname. Q What does 'Kee' mean? A 'Memorandum.' Q It was the store name? A Yes." The substance of this testimony is that the respondent said to the complainant "the business belongs to us" and that her surname appeared in the name under which the business was conducted. Conceding the testimony to be true, in determining its effect the relation of the parties to each other at the time the statement by the respondent was made must be kept in mind. The complainant then believed, and she also supposed the respondent believed, that she was his lawful wife. Under these circumstances it would be a strained construction to evolve out of this testimony an express agreement to share the assets and accumulations of a business enterprise. Many a husband has said to his wife: "This is our home" or "this is our automobile" or "these shares of stock are ours." It would hardly be contended that such expressions constituted an express agreement between the husband and wife that they were joint owners of the property referred to and its increment, although it had been acquired by their joint efforts.

Taking the view of the evidence most favorable to the complainant, her claim that there was an implied agreement that she and the respondent were joint owners of the property cannot be sustained. According to her

testimony she honestly believed that she was the respondent's lawful wife. She believed this from the time the ceremony was performed at Kohala in 1884 until she was disillusioned by the *Parke* decision in 1920. Assuming that she gave the respondent $200 in 1887, she believed it then and she continued to believe it during the years she worked in the store and delivered merchandise and took care of the household. There certainly can be no legal implication from these facts of an agreement between herself and the respondent that they were to share in the assets and accumulations of the business that was conducted. Such implication is no stronger than if she had been the lawful wife of the respondent. Whether the marriage was lawful or unlawful, if she acted under the belief that it was lawful the natural inference is that her contributions of labor and money were made in an effort and with the desire to build up and accelerate the success of the man whom she supposed to be her lawful husband. It has been held that under such circumstances an informal wife, upon discovering the illegality of her marriage, cannot even maintain an action against her putative husband for the value of her labor and services. For instance, in *Cooper* v. *Cooper,* 147 Mass. 370, 372, 17 N. E. 892, where a woman had performed services under a mistaken belief that she was married to the man with whom she lived, the court said: "But the fact that the plaintiff was led by mistake or deceit into assuming the relation of a wife, has no tendency to show that she did not act in that relation; and the fact that she believed herself to be a wife excludes the inference that the society and assistance of a wife which she gave to her supposed husband were for hire. It shows that her intention in keeping his house was to act as a wife and mistress of a family, and not as a hired servant." There are de-

cisions of other courts to the same effect. This exact question, however, is not before us and we do not decide it. We mention it only to emphasize the conclusion that there is no implied agreement that the complainant was to have a share of the respondent's property. The complainant's first theory therefore, while sound in law, must fail for the lack of sufficient proof.

Her second theory is more strongly supported by the evidence but the question remains whether it is sustained by the law. Whatever unhallowed relations the respondent may have intended to establish with the complainant, it is quite clear from the evidence that she believed that the ceremonies and festivities that occurred at Kohala in 1884 united her in lawful wedlock to the respondent. In this belief she lived with him for many years, becoming the mother of his children. In this belief she collaborated with him in the accumulation of a considerable fortune and, according to her testimony, not until after the *Parke* decision was rendered did she realize that the marriage was utterly illegal and that she had no standing as his wife.

It is contended by the respondent that whatever may have been complainant's belief, prior to 1891, as to her relations with him, after that time she knew she was not his lawful wife but was merely his concubine. This contention is predicated on the following facts: In 1891 the respondent sent to China for another woman, Ho Keau, and upon her arrival in Honolulu he procured a statutory license to marry her. The marriage took place in May of that year and Ho Keau went to live with the respondent as his wife. The respondent testified that before sending for Ho Keau he informed the complainant of his intention and that she said: "That's your business." He also testified that the complainant was present at the wedding feast when he married

Ho Keau and that she assisted in receiving the guests who were present on that occasion and that thereafter her position in the household was that of a servant. There is no evidence, however, that the complainant was told at this time that the marriage of the respondent and Ho Keau was a legal marriage and that her marriage to him was illegal. It is undisputed that the complainant continued to live with him and that she bore him several children.

In considering the probable influence of these facts upon the complainant's belief as to what were her relations with the respondent after his marriage to Ho Keau, it must be remembered that she was a Chinese and not a Caucasian woman. She was born in China where concubinage was recognized and practiced. She knew that a ceremony had been performed at Kohala in 1884 which she believed made her the respondent's lawful wife and that she had thereafter for several years lived with him as his wife. It can scarcely be inferred, therefore, that her knowledge that the respondent had sent to China for another woman and on her arrival had gone through a marriage ceremony with her degraded the complainant to the position of a concubine. That the respondent himself did not entertain any such belief is shown by his subsequent conduct and statements. In 1906, when he was a witness before the immigration authorities, he testified under oath that the complainant was then his wife. In 1907 the complainant went to China where she remained until 1910. Upon her return to Honolulu the respondent, in order to get her admitted into the Territory, testified under oath before the immigration authorities that she was his wife and that he married her at Kohala in 1884. In 1915 he again testified before the immigration authorities to the same effect. In 1919 the respondent applied to the land court for the registration

of title to a certain parcel of land situated in Honolulu. In his written petition he made the following affidavit: "That I am married; my wife's name is Fung Shee; that I was married in the year 1885 to said Fung Shee at Kohala, Island of Hawaii, Territory of Hawaii, according to the Chinese marriage custom, and no officer performed the marriage ceremony." It is not denied that the Fung Shee mentioned in this affidavit is the same person as the complainant in this case. On March 21, 1910, the United States grand jury returned an indictment against the respondent charging him with bigamy. The two women mentioned in the indictment were the complainant and Ah Keau. Ah Keau is the same woman to whom the respondent was married in 1891. Upon arraignment the defendant (the respondent herein) entered a plea of *nolo contendere* and was punished by imprisonment in the marshal's office for one hour and a fine of $500. The punishment was duly executed. On various occasions subsequent to 1901 the complainant joined with the respondent, as his wife, in the execution of deeds of conveyance of real estate. In explanation of these various statements and the plea of *nolo contendere* and the execution of the deeds the respondent testified that he acted under the advice of his counsel who, during that time, was the late Judge Humphreys, a member of the bar of this court. This explanation instead of weakening the conclusion that, after 1901, the respondent believed complainant was his wife, strengthens it. If Judge Humphreys advised him that the complainant was his wife it must have been on information given him by the respondent himself. This information being sufficient to convince Judge Humphreys, his advice to the respondent merely confirmed the belief the respondent evidently already had. If the respondent did not believe that his marriage to Ho Keau

in 1891 was a repudiation of his marriage to the complainant in 1884, there is certainly no stronger reason for thinking that the complainant had any such view. In *Godfrey* v. *Rowland,* 16 Haw. 377, this court decided that the statutory requirement that a license to marry be obtained was merely directory and that a marriage without a license was not void. This decision was rendered in 1904 and was sufficient to remove from the complainant's mind any doubt (if she had any) that she was the respondent's lawful wife. It also justified Judge Humphreys' advice to the respondent.

There is great inherent justice in the complainant's claim that, inasmuch as she has, without fault on her part, been disappointed in her expectations as the respondent's wife, she should be compensated by being given a share in the wealth she helped to accumulate. Under the civil law her claim would receive recognition. This court, however, cannot predicate its judgments on the civil law. We derive our law from three sources— the enactments of the national Congress, when they are applicable to the Territory, the enactments of the territorial legislature, the common law of England and the principles of equity. There are neither congressional nor territorial enactments relating to the question now under consideration. We must, therefore, inquire whether there is any principle of the common law or equity upon which the complainant's second theory can be sustained. In order to ascertain the common law we are authorized to look to English and American decisions. If they do not disclose some principle upon which the complainant can be granted the relief she claims she is entitled to, we are powerless to manufacture one for her. We certainly have no power to legislate nor have we the power by our mere *ipse dixit* to originate a principle that has never been recognized at common law. We are not a

lawmaking body.  Our dealings with the law are limited to its interpretation and its application.  We may, under conditions that justify it, make new applications of established principles but we cannot create principles. Section 1, R. L. 1925, reads as follows: "The common law of England, as ascertained by English and American decisions, is declared to be the common law of the Territory of Hawaii in all cases, except as otherwise expressly provided by the Constitution or laws of the United States, or by the laws of the Territory, or fixed by Hawaiian judicial precedent, or established by Hawaiian usage, provided, however, that no person shall be subject to criminal proceedings except as provided by the written laws of the United States or of the Territory."  This section makes the principles of the common law just as binding on this court as if they were embodied in legislative enactments.  We have no more power to change them than we have to change a statute.  Likewise, we have no more power to interpolate into them a rule or principle that is not already there than we have to add an additional provision to a statute.  If the common law is inadequate in any respect to meet the needs of the people or if it contains some dogma that is inimical to the general welfare or that is unsuited to our times and conditions, it is a legislative and not a judicial function to provide the remedy.  In mere matters of procedure we perhaps have more latitude.  This, however, we do not now decide. Certainly, when a fundamental question is involved, as in this case, we have no alternative but must cleave to the common law.  Some courts have recognized the claim of the informal wife on principles that are applicable to partnerships.  This is illogical.  A partnership, *inter se,* is the result of agreement express or implied. If there is no express agreement and the facts and cir-

cumstances are such that the law does not imply an agreement, there is no relation of partnership and the principles governing the rights and liabilities of partners to-each other have no relevancy. As we have already observed, there was no express agreement between the parties to this suit that they were to become partners nor do the facts and circumstances indicate an implied agreement that they were to become partners or even joint adventurers. Other courts have granted relief on principles governing implied trusts. This also is illogical. Perry on Trusts, Sec. 112, gives this definition of implied trusts: "Implied trusts are those that arise when trusts are not directly or expressly declared in terms, but the courts, from the whole transaction and the words used, *imply* or infer that it was the intention of the parties to create a trust." Again, as we have already observed, there was no agreement express or implied between the complainant and the respondent that the former was to have any interest in the property which she helped to create—so there can be no implied trust. Still other courts have derived their authority to grant relief, from "community property" statutes. We have no such statute. Is there then *any* established principle of the common law or equity that reaches the case? In answering this question it must be kept in mind that equity jurisprudence, like the common law, is circumscribed by established rules and principles. Courts of equity have no more power to add to these rules than courts of law have to add to the rules of the common law. There was a time in the early history of equity when it was thought that the conscience of the chancellor was the only guide and that whatever seemed to him to be just might be accomplished by his decree. The danger of this conception of equity as a system of jurisprudence soon became apparent. Different chancellors

had different ideas of justice—which of course left equity without any chart or compass by which to steer its course. As a result the original conception was abandoned and definite rules and principles were substituted for the indefinite conscience of the chancellor. In *Ainini* v. *Kala,* 6. Haw. 16, 18, this court said: "It is popularly supposed that the province of equity is to set aside the rigid rules of common law and ancient precedents, and to decide arbitrarily, according to the merits and hardships of each case. Nothing is further from the truth or more full of danger to the administration of justice than such a doctrine. Under the Constitution and laws, no court can exercise a discretionary power in defiance of sound and established principles, both of law and equity. 'There are certain principles on which courts of equity act which are very well settled. The cases which occur are various, but they are decided on fixed principles. Courts of equity have, in this respect, no more discretionary power than courts of law. They decide new cases as they arise by the principles on which former cases have been decided; but the principles are as fixed and certain as the principles on which the courts of common law proceed.' Lord Redesdale, in *Bond* vs. *Hopkins,* 1 Sch. and L., 428."

The complainant cites several cases which she contends support her claim to relief. Let us examine these cases. In *Coats* v. *Coats,* 160 Cal. 671, the complainant (the husband) brought suit against his wife to have their marriage annulled on the ground that she was, at the time of the marriage, physically incapable of entering the marriage state. The parties had lived together as husband and wife for several years, during which time by their united efforts property of considerable value had been accumulated. The court annulled the marriage and awarded the wife a share of the property. At page

675 of its very able opinion, the supreme court said: "Passing, for the moment, the consideration of certain subsidiary problems which arise on the particular facts found, this appeal presents for determination, primarily, the question whether a woman who has in good faith entered into a marriage which may be avoided at the instance of the other party, is entitled, upon or after annulment, to any participation in the property which has been accumulated by the efforts of both parties during the existence of the supposed marriage, and while she in good faith believed that such marriage was valid. The mere statement of the question would seem to be sufficient to require an answer in the affirmative. To say that the woman in such case, even though she may be penniless and unable to earn a living, is to receive nothing, while the man with whom she lived and labored in the belief that she was his wife, shall take and hold whatever he and she have acquired, would be contrary to the most elementary conceptions of fairness and justice." The court evidently realizing that justice alone unsupported by a principle of law would not be sufficient to justify a judgment in favor of the wife proceeded to search for some substantial ground upon which to base its ultimate conclusion. This ground was found in the "community property" statute. The court then proceeds in its opinion as follows: "Even though it may be true that, strictly speaking, there is no 'community property,' where there has not been a valid marriage (*Chapman* v. *Chapman*, 11 Tex. Civ. App. 392, (32 S. W. 564); see 68 Am. St. Rep. 376, note), the courts may well, in dividing gains made by the joint efforts of a man and a woman living together under a voidable marriage which is subsequently annulled, apply, by analogy, the rules which would obtain with regard to community property where a valid marriage is termi-

nated by death of the husband or by divorce.   The apportionment of such property between the parties is not provided by any statute.   It must, therefore, be made on equitable principles.   In the absence of special circumstances, such as might arise through intervening claims of third persons, we can conceive of no more equitable basis of apportionment than an equal division. Until the making of the annulment decree, the marriage was valid, and the property in question was impressed with the community character.   Upon annulment, such property, even though it be no longer community property, should be divided as community property would have been upon a dissolution of the marriage by divorce or the death of the husband." The influence of community property law on the courts of California is made even more apparent in *Schneider* v. *Schneider*, 191 Pac. 533, 11 A. L. R. 1386.   In that case the court said: "In California, as in Texas, the common law is the general rule of decision, but in both states the law regulating the mutual property rights of married persons is radically different from that law; and, while we do not wish to be understood as saying that the rules of the common law as to husband and wife apply to no case under our system, yet we agree with the Texas courts that the common-law rule as to the consequences of a void marriage upon the mutual property rights of the parties to it is inapplicable where the community property regime prevails.   This conclusion is dictated by simple justice, for where persons domiciled in such a jurisdiction, believing themselves to be lawfully married to each other, acquire property as the result of their joint efforts, they have impliedly adopted, as is said in the Texas case cited, the rule of an equal division of their acquisitions, and the expectation of such a division should not be defeated in the case of innocent persons." In *Morgan*

v. *Morgan,* 1 Tex. Civ. App. 315, 21 S. W. 154, 155, the question was directly presented whether or not a w o m a n, who in good faith contracts marriage with a man by reason of whose previous invalid divorce such marriage is a nullity, may assert community rights in the property accumulated while the two lived together under such marriage and the question received an affirmative answer. The court, speaking through Mr. Justice Head, said: "It will thus be seen that the strong tendency of our judges in the past has been to hold that property acquired in this state, under our community laws, by a man and woman living together as husband and wife, should belong to them in equal shares, whether they were legally married or not, and why should this not be so, especially when they have attempted to enter into a marriage contract, and believed that they were lawfully husband and wife? In such cases, by attempting to enter into the marriage contract, they agreed, as far as they had the power to agree, that they would live together as husband and wife, and that all property that they might thereafter acquire should be community property, and belong to them in equal portions. * * * * It will not do to refer to the decisions in common-law states to sustain the proposition that the woman, under such circumstances, has no right to any part of the property so acquired. In those states, by entering into the marriage contract, she understood that all the property they might acquire while living together should belong to the husband, but in this state she understood that their rights in the property they might accumulate should be equal." This case is cited as supporting authority in *Schneider* v. *Schneider, supra.* It is evident that both the California and Texas courts based their conclusions on community property statutes. In this jurisdiction justice has no such refuge.

The initial case on the subject, in the State of Washington, is *Buckley* v. *Buckley,* 50 Wash. 213. In that case the putative wife brought suit for divorce or annulment of marriage and claimed an interest in the property jointly accumulated. A decree was rendered annulling the marriage and also awarding to the complainant a share of the property. In its opinion the court said, at page 216: "Where a woman in good faith enters into a marriage contract with a man, and they assume and enter into the marriage state pursuant to any ceremony or agreement recognized by the law of the place, which marriage would be legal except for the incompetency of the man, which he conceals from the woman, a status is created which will justify a court in rendering a decree of annulment of the attempted and assumed marriage contract, upon complaint of the innocent party; and where in such a case the facts are as they have been found here, where the woman helped to acquire and very materially to save the property, the court has jurisdiction as between the parties, to dispose of their property as it would do under Bal. Code, § 5723, (P. C. § 4637), in a case of granting a divorce—awarding to the innocent, injured woman such proportion of the property as, under all the circumstances, would be just and equitable." . It is apparent that the Washington court, like the California and Texas courts, found a statute upon which to base its judgment. What conclusion would have been reached without the statute is mere speculation. Mr. Justice Rudkin, now a member of the federal court of appeals, ninth circuit, in a concurring opinion in *Buckley* v. *Buckley* dissented from the view that the statute was applicable but concurred in the judgment for the reason that, on principle, it was correct. In his concurring opinion Judge Rudkin said: "I approve the rule announced in the authorities cited

in the majority opinion; viz., that the court may restore to the woman any property the man may have acquired by or through her, may compensate the woman for any pecuniary benefits derived by the man during the existence of such relation, or may make a just and equitable distribution of their joint accumulations." We have examined the authorities cited in the majority opinion and referred to by Judge Rudkin. Most of them relate to questions of alimony *pendente lite* and are therefore inapplicable to the instant case. In the more recent case of *Knoll* v. *Knoll*, 104 Wash. 110 (176 Pac. 22, 11 A. L. R. 1391), the supreme court of Washington reaffirmed *Buckley* v. *Buckley*. No mention, however, is made of the statute which guided the court in the latter case. In the *Knoll* case the conclusion of the court seems to have been predicated on principles relating to partnerships. At page 114 the court said: "The fact that the appellant knew that she had no right to be married in the State of Washington, but believed that she had a right to be married in a foreign jurisdiction and that such marriage would be valid here, does not make the contract of marriage meretricious nor taint her relation with the respondent with conscious guilt. Such good faith, whether resting in mistake of fact or mistake of law, is enough to authorize the courts, in an action brought for the annulment of the marriage, to treat the relation as a partnership as to all property acquired by the joint efforts of the parties." As we have already indicated we think the principles governing partnerships are not applicable. Besides citations from its own jurisdiction including *Buckley* v. *Buckley, supra,* the court cites in support of its conclusion the Texas cases including *Morgan* v. *Morgan, supra.* As we have already pointed out, the Texas decisions were based on community property laws. Washington likewise has com-

munity property statutes, and this fact no doubt accounts for the citation of Texas authorities. In *Powers* v. *Powers,* 200 Pac. (Wash.) 1080, the supreme court of Washington held to the views already announced by that court. The decisions from two other states are cited by appellant. In *Fuller* v. *Fuller,* 33 Kans. 582, the question for the first time received the attention of the supreme court of Kansas. In a dictum the court said: "It is our opinion, however, that in all judicial separations of persons who have lived together as husband and wife, a fair and equitable division of their property should be had; and the court in making such division should inquire into the amount that each party originally owned, the amount each party received while they were living together, and the amount of their joint accumulations." In *Werner* v. *Werner,* 59 Kans. 399, a later case, the wife brought suit against the husband for divorce. In his answer the husband alleged that he was induced to enter the marriage relation through the misrepresentation and fraud of the complainant and that she was at the time the wife of one John G. Cole who was then living and from whom she had not obtained a divorce. The respondent, therefore, asked for an annulment of his marriage to the complainant. A decree of annulment was rendered. The question was then presented whether or not the complainant was entitled to a share of the property which had been accumulated through the joint efforts of herself and the respondent. In giving an affirmative answer to this question the court said: "The division that was made was eminently equitable and just. While Emil Werner had considerable property at the time of the marriage and Rosa had none, the testimony tends to show that the property which they have now is largely the result of their joint labor and earnings. She was active, indus-

trious, and faithful, and, besides household work, she was an efficient aid in conducting and carrying on the different branches of business in which he was engaged. In the early days she performed labor of the hardest and most menial character, and throughout the twenty-two years in which they lived together as husband and wife she was diligent, tireless and economical in building up a business, and in gathering the property which they held at the time of the trial. She appears to have been a valuable assistant in managing the business and in caring for the property in which their earnings were invested. A portion of the time the title to the property was in her name, but at the time of the separation he held the legal title to most of it. The fact, however, that the legal title stood in the name of one or of the other of the parties does not prevent a just distribution of the property jointly contributed and in fact jointly owned by both. If a separation had occurred while the property stood in her name, it would hardly be contended that he would be deprived of any share or interest in the same. No more should she be deprived of a fair share of the fruits of her skill, industry and toil while she occupied a partnership relation with him. The court has the same power to make equitable division of the property so accumulated as it would have in case of the dissolution of a business partnership." What was mere dictum in *Fuller* v. *Fuller* by this decision became the law of Kansas. The Kansas court was not influenced by community property statutes, there being no such statute in that state. In our appraisal of the Kansas cases, however, we must consider that, while Kansas is a common-law state as distinguished from a civil-law state, the obligation of her courts to the common law of England is not as binding as that of this court. In 1868 the following statute was enacted by the legislature

of Kansas and has remained in force ever since: "The common law as modified by constitutional and statutory law, judicial decisions, and the conditions and wants of the people, shall remain in force in aid of the general statutes of this state; but the rule of the common law, that statutes in derogation thereof shall be strictly construed, shall not be applicable to any general statute of this state, but all such statutes shall be liberally construed to promote their object." This statute is more liberal than ours on the subject of the common law and authorizes Kansas courts to take greater liberties with it than our statute permits us to take. Moreover the Kansas court, in *Werner* v. *Werner,* like the Washington court in *Knoll* v. *Knoll, supra,* seemed to think that relief should be granted the woman on the principles of partnership. With due deference to these courts, we are unwilling—as we have already indicated—to adopt this reasoning. .

In *Krauter* v. *Krauter,* 190 Pac. (Okl.) 1088, the plaintiff (the informal wife) brought an action to annul her marriage to the defendant on the ground that it was incestuous and therefore void. She alleged in her complaint that she entered into the marriage in good faith and that at that time neither she nor the defendant had any property but by their joint accumulations and with the aid and assistance of their parents they had accumulated considerable property, consisting of certain real estate. The trial court found that the marriage was incestuous and therefore void and that, inasmuch as considerable property had been accumulated by the joint efforts of the parties, it should be divided between them, share and share alike. The supreme court affirmed the judgment and in its opinion said: "The record discloses that the plaintiff and defendant were first cousins, and at the time of their marriage the plaintiff was 15 years

of age, and the defendant about 22 years of age. The cases of this kind and character are not very numerous, and the rights of the parties thereunder often present very intricate and delicate questions. If plaintiff in error's position is true, we are confronted with an unusual condition. The defendant in error, a farmer girl 15 years of age, entered into a marriage contract with her first cousin, which under the law was void. At the time of the marriage they had no property. For practically 15 years they worked and toiled together and have saved and accumulated about $16,000 worth of property over and above their indebtedness. The court found that the plaintiff had assisted in accumulating the property and the same was the saving of their joint efforts. Can it be said that under such conditions the defendant in error shall be turned out and receive no benefits from her 15 years of work and the accumulations thereof, and her pretended husband, although a party to the void marriage, reap all the benefits from their joint accumulations, and not only retain the fruits of his labor, but her accumulations also free from any right or claim of the plaintiff? We do not believe that such a contention is tenable under the law, nor can such a harsh and cruel interpretation of the law be sustained. While it is true the general rule is, when a marriage is void because incestuous or bigamous or for other reasons, the woman acquires no right to dower, curtesy, or alimony notwithstanding she has acted in good faith; a void marriage ordinarily conferring no right upon either of the parties in respect to the property of the other, such as would be conferred if the marriage was valid. But a different question is presented where the property is accumulated during the existence of the void marriage relation." After citing the dictum in *Fuller* v. *Fuller, supra, Werner* v. *Werner, supra, Coats* v. *Coats, supra,*

and *Buckley* v. *Buckley, supra,* the court proceeds as follows: "What as a matter of right and equity would become of this property that was jointly accumulated by the parties? Would a court of equity decree it to be the property of one to the exclusion of the other? We do not think so, and while it may be true that the relation between the parties could not strictly be termed a partnership, but it might be termed a quasi partnership, and the different courts have dealt with the situation on the theory that the relation of the parties created a quasi partnership. We think it is immaterial whether it is called a quasi partnership or not, but the facts bring the case squarely within the rule that a court of equity has the inherent power where the parties appear in said court, and the court has jurisdiction of both the parties and their property to adjudge the marriage void, and settle their property rights acquired during the existence of the marriage relation and make an equitable division thereof." In considering this decision we are not unmindful that there are no community property statutes in Oklahoma and that it is a common-law state. Unlike Hawaii, it is not made a common-law state by statute but is so classified for historical reasons by its own court. *McKennon* v. *Winn,* 1 Okl. 327 (22 L. R. A. 501). Whether the Oklahoma court felt itself as firmly bound to the common law as we are, is mere conjecture; assuming that it did, we, nevertheless, cannot accept *Krauter* v. *Krauter* as authority unless it is founded on some established principle of the common law or equity which, in our judgment, is applicable to the instant case. The decision was undoubtedly prompted by a fine sense of justice but that alone does not make it a safe legal precedent. The conclusion seems to have been based on what the court believed to be just and right and not on any statute or rule of the common

law. The citation of and quotations from Kansas, Texas, California and Washington decisions lead us to assume that the Oklahoma court was influenced in its judgment by the reasoning of those courts. As we have already indicated, we think those cases are not applicable to the controversy before us.

Counsel for the respondent have brought to our attention many cases which they claim declare the common law on this subject. Only one of them is applicable. The others involved questions and announce principles that are entirely foreign to the present case. The case that is applicable is *Schmitt* v. *Schneider*, 109 Ga. 628, 35 S. E. 145. That was a suit brought by a woman, who had lived several years with a man under a void marriage, to establish her right to a portion of the property which had been accumulated by their joint efforts. In its opinion the court said: "During the years she lived with the defendant she rendered him services of a stated monthly value as housekeeper, and in conducting a boarding house, and rearing and caring for his children, etc. She also turned over to him nearly all the money, amounting to a specified amount per month, which she earned in her profession of nurse and midwife. In rendering the services mentioned, and delivering to the defendant her money, she fully believed she was his lawful wife. From his own earnings, and with her means and assistance, he has accumulated considerable property, and now has a named sum deposited with the Maddox-Rucker Banking Company, also stock to a specified amount in the Loan & Building Company, and promissory notes, for divers sums mentioned, executed by the individuals named as co-defendants, and secured by mortgages on realty. All this property and other assets in the name of the defendant Schneider were 'derived from the proceeds of the earnings of this plaintiff and

of said defendant jointly.' 'She has for all of these years been living with him in absolute ignorance of the fact that he was never divorced from his wife, and now claims that by reason of the fraud he practiced upon her, and his misrepresentations, she is entitled to share in the property owned and held in his name, and in equity and in good conscience the court should decree that equal division thereof should be made between them.' * * * Taking into view all of the above allegations and prayers, it is clear that the scheme of the petition was to obtain an accounting from Schneider, and a division, in kind, of property alleged to belong jointly to him and the plaintiff. Her object seems to have been to obtain a winding up and settlement of a quasi partnership between them, having its origin in the relations they had sustained towards each other during the years of their cohabitation. Manifestly, in this view of the petition, it was without equity or merit. There was no actual partnership, of course; nor did any trust in the property acquired by Schneider arise for the benefit of the plaintiff. She gave him no money to invest for her individual use, nor was there any undertaking or promise on his part, express or implied, to invest for her, or allow her any interest whatever in his accumulations. For her services, and for her money which went into his hands, he may be liable to pay; but the only relation which could, relatively to these matters, arise between them, is that of debtor and creditor. That he may have perpetrated a fraud upon her gives her no title, legal or equitable, to property acquired by him in his own right, although it may have been purchased with his ill-gotten gains; for, to compensate a person upon whom a fraud has been committed, the law affords full relief by providing for the recovery of damages." The Georgia court found itself in the same position as we are now in.

There was no principle of the common law or equity which would justify a decree in favor of the informal wife. She and the man whom she married, without sanction of law, were not partners nor did there exist between them any relation of trustee and *cestui que trust*. There was no community-property or other statute which might by analogy afford her relief. So, like the complainant in this case, however much justice there may have been in her cause she was remediless so far as the suit she brought was concerned.

It is contended by appellee that, even though it should be held that complainant's second theory is supported by the common law or some principle of equity, she nevertheless cannot prevail in this suit because of section 2958, R. L. 1925. This section is as follows: "Every woman who shall be deceived into contracting an illegal marriage with a man having another wife living, under the belief that he was an unmarried man, shall be entitled to a just allowance for the support of herself and family out of his property, which she may obtain at any time after action commenced upon application to any circuit judge having jurisdiction; provided, always, that such allowance shall not exceed one-third of his real and personal estate. In addition to such allowance, the judge may also compel the libellee or defendant to advance reasonable amounts for the compensation of witnesses and other reasonable expenses of trial to be incurred by the libellant or plaintiff." We cannot agree with this contention. The statute must be construed with reference to its setting. It is a part of the chapter on the annulment of marriage and its manifest purpose is to single out one instance, *when such proceedings are brought,* in which the putative wife may be awarded a portion of the putative husband's property. In the instance mentioned in the statute she is entitled to this

portion even though she contributed nothing to the accumulation of the property itself. The statute would not affect the rights of a woman, if such rights were recognized by the common law or equity, who under other circumstances, by her contributions, either of labor or money, helped to build up the fortunes of her putative husband in the honest but mistaken belief that she was lawfully married to him. In construing section 2955, R. L. 1925, which enumerates the grounds on which annulment of marriage may be granted, this court held in *Sakakihara* v. *Sakakihara,* 26 Haw. 89, that such enumeration did not, by implication, deprive a court of equity of jurisdiction to annul a marriage on some other ground that was recognized by courts of equity. By the same reasoning the conclusion seems inescapable that the mention in section 2958, *supra,* of one instance in which the putative wife is entitled, in a *statutory action for annulment,* to a share of the husband's property would not be exclusive of her rights in a case similar to the instant case if such right was recognized by the common law or equity.

The decree is affirmed.

*E. H. Beebe* (*Thompson, Cathcart & Beebe* on the briefs) for petitioner.

*A. G. M. Robertson* (*H. Irwin* and *Robertson & Castle* on the briefs) for respondent.

### CONCURRING OPINION OF PERRY, C. J.

I concur in the conclusion that no contract, express or implied, is shown to have been entered into by the parties with relation to a joint ownership of property to be accumulated by the husband and in the findings and reasoning leading to that conclusion. I concur also in the conclusion that in this jurisdiction a putative wife, in the position of the complainant, cannot recover

a share of the husband's property, accumulated with such assistance as a conscientious or an ambitious wife ordinarily gives her husband and as this complainant gave to the respondent. Except as herein stated, I concur also in the reasoning supporting the latter conclusion.

Imbued, as both parties may well have been, with Chinese notions of marriage and concubinage, the case is, upon the evidence, susceptible of more than one argument as to the meaning attached by the complainant at the time to the ceremony in which she took part in Kohala in 1884. It is unnecessary to determine whether either or both parties believed at the time that the marriage was valid under the laws of Hawaii and that it meant just what marriage means to us. It may be assumed for the purposes of this case that the complainant did so believe and that the respondent knew of its invalidity and intended thereby to deceive the complainant,—for even upon this assumption the prayer of the complainant in this suit cannot be granted.

It seems to me to be beyond doubt that at common law no such remedy as is sought by this complainant was available to a putative wife. In none of the books is the statement to be found that at common law such a remedy was allowed to a woman who had in good faith entered into a marriage which was subsequently found to be, for some reason, invalid. A careful reading shows that practically every decision rendered in favor of that supposed right of the wife is based upon the assumption that at the common law there was no such remedy. In some the civil law is cited as the authority for the rule adopted. In others the community property law, in force in those jurisdictions, and its analogies clearly influence the conclusions reached. In still others resort is had to the theory of partnership or *quasi* partnership.

In none of them is the common law referred to as the authority for the allowance.

In England the court in 1909, referring to the Matrimonial Causes Act of 1907, said: "What, *prima facie,* are her rights? The object of that Act, so far as nullity suits are concerned, was to remedy a defect that previously existed. In some cases of nullity, for instance, a husband or wife of one of the parties turned up after a number of years, and there was no power, in the absence of a settlement, to do anything for the woman who had believed herself a wife, and perhaps had children, and who might be left destitute." *Dunbar* v. *Dunbar,* L. R., Probate Div. 1909, 90, 91. In *De France* v. *Johnson,* 26 Fed. 891, 894, referring to annulment of a void marriage and to the fact that the statutes of Minnesota gave no validity to the claim of the wife, although she was in ignorance of a former wife living, the court said that "she is subject to the harsh rule which declares a second marriage *ipso facto* void, and denies to her any right in Johnson's" (the husband's) "estate" and spoke of this as the injustice of "a rule of the common law which subjects the innocent party to the harsh consequences of such a connection." In *Carpenter* v. *Smith,* 24 Ia. 200, 202, the court said: "The fact that S. R. Carpenter had a lawful wife living rendered the marriage with Susan A. Carpenter void *ab initio.* He acquired no rights thereby; she lost none. The marriage in no way affected her positive or relative rights, for, in truth, it was, in law, no marriage, the man and woman being incapable of entering into the marriage relation with each other. He acquired no right to her property and she none to his, by virtue of the marriage, and they stood in the same relation to each other as though it had never taken place." No statute was cited and the reference evidently was to the common law.

"No authority has been produced in which a *feme sole,* under the circumstances of this case, has recovered the value of her dower in the estate of her wrongdoer. Had it been allowed, such recoveries must have been frequent, as divorces have often been granted to women for causes which render the marriage null and void, *ab initio.* But dower does not attach, by virtue of any contract, express or implied, made by the husband to the wife; it is a consequence of marriage, and is a provision made by law for the sustenance of the widow and the nurture and education of her children." *Higgins* v. *Breen,* 9 Mo. 497, 501. No statute was cited and the reference was doubtless to the common law.

In *Schneider* v. *Schneider,* 191 Pac. (Cal.) 533, 534, 535, the court clearly recognized that under the common law the wife could not recover. It said, *inter alia*: "It will not do to refer to the decisions in common-law states to sustain the proposition that the woman under such circumstances has no right to any part of the property so acquired. In those states, by entering into the marriage contract, she understood that all the property they might acquire while living together should belong to the husband, but in this state she understood that their rights in the property they might accumulate should be equal.   *   *   *   In California, as in Texas, the common law is the general rule of decision, but in both states the law regulating the mutual property rights of married persons is radically different from that law.; and, while we do not wish to be understood as saying that the rule of the common law as to husband and wife apply to no case under our system, yet we agree with the Texas courts that the common-law rule as to the consequences of a void marriage upon the mutual property rights of the parties to it is inapplicable where the community property regime prevails."

Again, in 13 R. C. L. 995: "At common law a valid marriage is necessary in order that the parties may acquire rights in each other's property by virtue of that relation. When a marriage is void, as distinguished from one which is voidable merely, and is deemed perfectly valid unless annulled during the lifetime of the parties, as where one of the parties had a wife living at the time of a second marriage, the broad view is taken, though recognized as a harsh one, that the wife in such a case, though innocent and though she acted in good faith, does not acquire the rights of a lawful wife. Thus it is a well settled rule of the common law, that to entitle a woman to claim dower in the estate of a decedent she must have been his lawful wife and to entitle a man to claim an estate by the curtesy in the realty of a deceased wife he must have been her lawful husband." At page 994 the same authority states the rule of the civil or Spanish law to the contrary. See, also, *Schmitt* v. *Schneider,* 35 S. E. (Ga.) 145, 146, referred to in the leading opinion; and 19 A. & E. Ency. L. 1221.

Once it is ascertained, as this court now does unanimously, what the rule of the common law was and that that rule is not rendered inapplicable in the particular case by any statute, prior decision or custom of this jurisdiction, the common-law rule is the law and must be enforced. R. L. 1925, section 1, so commands. This court has not the liberty which the supreme court of Kansas enjoys in the matter. By statute in that State the common law is adopted or continued in force "only as modified by constitutional and statutory law, judicial decisions, *and the conditions and wants of the people."* *Cooper* v. *Seaverns,* 25 L. R. A., N. S. (Kans.), 517, 524. The expression italicized gives the court wide latitude in rejecting the provisions of the common law which are

deemed to be unsuited to present conditions. An exception or qualification to the same effect was recommended to the legislature of Hawaii at its session just ended and was not adopted. Section 1 of the Revised Laws gives us no such latitude.

I am unable to join in the view that this failure of the common law to authorize a grant to a putative wife of a share of the property of the husband accumulated with her aid after the marriage is, in this Territory, an injustice to her. Under the laws in force here in 1884 and ever since a wife, lawfully married, acquires no right to a share, as such, of the husband's property, accumulated though it be, in part, as a result of her sacrifices and assistance. The ordinary wife renders that assistance, not because of any expectation of reward in the form of an allotment out of that property for herself but from other motives as, for example, an ambition to see her husband succeed and a desire to have him reach a condition financially where he can better provide for and maintain her and her family. If the marriage is valid the wife is legally entitled to receive from the husband nothing more than support and maintenance during his life and dower after his death, if she survives him. This is not a suit for maintenance and support. There is no allegation that the complainant has not received the maintenance and support which would have been her due as a wife; and if she has received that she has received all that she could have lawfully expected to receive when she entered into the supposed marriage. Nor is it a suit for an allowance to her by way of dower. It is not yet known whether the complainant will survive the respondent. If the respondent intentionally deceived her with a spurious marriage she has a right to an action at law

against him for damages for the deceit (*Cooper v. Cooper*, 147 Mass. 370, 372) ; but in such an action the principles governing a recovery would be very different from those sought to be applied in this suit. In an action at law the measure of the recovery would be the amount of damages which she has suffered and not the amount of property which the respondent owns.

For another reason, also, a division of the property as prayed for cannot be decreed. Our statutes sufficiently indicate the policy of the Territory in this respect. R. L. 1925, section 2958, provides: "Every woman who shall be deceived into contracting an illegal marriage with a man having another wife living, under the belief that he was an unmarried man, shall be entitled to a just allowance for the support of herself and family out of his property, which she may obtain at any time after action commenced, upon application to any circuit judge having jurisdiction; provided, always, that such allowance shall not exceed one-third of his real and personal estate. In addition to such allowance, the judge may also compel the libellee or defendant to advance reasonable amounts for the compensation of witnesses and other reasonable expenses of trial to be incurred by the libellant or plaintiff." *Enumeratio unius est exclusio alterius.* If it had been the purpose of the legislature to permit a similar allowance to every woman who has been deceived into contracting an illegal marriage, irrespective of the method of the deceit or the cause of the mistaken belief, that intention could have been easily expressed. This statutory grant of relief in cases where the erroneous belief of the wife was that the husband was an unmarried man clearly indicates the intention of the legislature not to allow the same or similar relief in cases where the erroneous belief was caused by other forms of deception or, as may have been the case in this

instance, was due to ignorance of the law. This partial modification of the common law excludes the possibility of a further modification. In another respect, also, this statute shows the legislative attitude that in the class of cases in which relief is granted at all the allowance shall be purely for the support and maintenance of the wife and family and not by way of a grant of a portion of the husband's estate not needed for this specified purpose. It seems to me that this statute alone, if there were nothing else to the case, would require a denial of the prayer for a portion of the respondent's estate.

I concur in the view that the decree appealed from should be affirmed but I do so without any thought that injustice is being thereby done to the complainant.