# WILLIAM FREDERICK KIENITZ *v.* PEGGY ROGERS SAGER, ALSO KNOWN AS PEGGY ROGERS KIENITZ.

## NOS. 2808 and 2809.

ARGUED NOVEMBER 12, 1952.          DECIDED JANUARY 31, 1953.

LE BARON AND STAINBACK, JJ., AND CIRCUIT JUDGE MURAKAMI IN PLACE OF TOWSE, C. J., DISQUALIFIED.

2

OPINION OF THE COURT BY LE BARON, J.

The petitioner brought a bill in equity against the respondent for annulment of their purported marriage and for the equitable relief of injunction to restrain the respondent from proceeding in a pending divorce action which she had brought against him, and of reformation of certain deeds, which conveyed title in real estate to the parties in his name and her purported married name as husband-and-wife grantees and expressly created estates by the entireties, so as to eliminate the respondent's name and cause title to be conveyed solely to the petitioner. The respondent combined her answer with a cross petition which not only joins with the bill in praying for a decree of nullity declaring void the purported marriage and thereby accedes to the bill's prayer for injunction but prays *inter alia* for reformation of the same deeds so as to change the title of the parties from that held by

them as tenants by the entirety to a title to be held by them as tenants in common, and for an equal division of other property and assets which it is alleged were jointly acquired during the quasi-marital relationship when they lived together as husband and wife. The petitioner answered. After a lengthy trial the chancellor filed a written decision of some thirty-five pages. Pursuant thereto he entered a decree of nullity declaring the marriage contract between the parties void. The decree grants equitable relief in full to the petitioner as prayed in his bill and denies the opposing relief to the respondent as prayed in her cross petition but orders the petitioner to pay the respondent $2500 for her attorney. The respondent appeals from the decree and relies upon a specification of alleged errors to certain findings of the chancellor. Consolidated with her appeal is the petitioner's. He appeals from the decree in so far as it orders him to pay respondent an attorney's fee.

Preliminary to considering these appeals it is well to determine the issues from the pleadings and to ascertain the theory on which the cause was tried below. The respondent's pleadings clearly admit the existence of the ground for annulment as alleged in the bill. That ground is in substance that the purported marriage between the parties and a prior purported divorce between the respondent and her husband were both void *ab initio* and that the respondent was and still is the legal wife of her husband and was never legally married to the petitioner. Such ground is predicated upon the respondent's fraud and so are the grounds for injunction and reformation as alleged in the bill. One phase of that fraud is her false representation that she was domiciled in the Territory at the time of her purported divorce. Another is her false representation that she was legally divorced and free to marry at

4

the time of her purported marriage. Still another is her false representation that on such marriage she became legally married to the petitioner and thereafter was entitled to be treated by him as his legal wife. The first phase of her fraud was perpetrated upon the divorce court and the others upon the petitioner. It is from the consequences of his reliance upon them that he seeks equitable relief, as well as from the effect of the final phase of her fraud in her pending divorce action. That phase was in the process of being perpetrated upon both the divorce court and the petitioner when he discovered her fraud as a whole. It is her false representation that she, as the lawful wife of the petitioner, is entitled to a divorce and alimony from him. In admitting the existence of the ground for annulment the respondent's pleadings do not deny the existence of her fraud as the basis of that ground but they do deny that she perpetrated its various phases "intentionally," "purposely" or "consciously." Her pleadings, however, interject a defense to the equitable relief of reformation as sought by the petitioner. That defense is essentially a legal one which, if sustained, would be valid irrespective of her fraud underlying the quasi-marital relationship between the parties. Succinctly stated, it is the defense of a binding joint venture or business partnership at law entitling each party to an equal share in its proceeds, accumulations and assets, out of which she claims he purchased the real estate. It thus presents the primary question whether there existed any such venture or partnership under which the respondent acquired valuable property rights or interests. That question was the real question in litigation below and constitutes the sole question meriting consideration on the respondent's appeal.

In holding that the allegations of the bill were proved,

the chancellor found *inter alia* that the petitioner (1) had no part in the respondent's fraud, (2) entered the purported marriage in good faith, (3) was the putative spouse, (4) not only relied on the false representation of the respondent that she was his legal wife, but (5) treated her as such a wife to the extent that in purchasing real estate with his own money he was persuaded by her to have her purported married name included with his name as husband-and-wife grantees and to have the deeds expressly create estates by the entireties consistent with his honest belief in and compatible only with their legal unity under a valid marriage, and (6) is not guilty of laches in bringing the instant suit after discovery of her fraud. Those findings are amply supported by the substantial, if not the undisputed, evidence and are not challenged on appeal.

Other findings, however, are challenged on appeal and as to them the respondent alleges error. Her specification is that the chancellor committed prejudicial error in finding (1) that the "respondent acted in bad faith and perpetrated a fraud upon the court in securing her divorce," (2) that the "respondent did not enter into the purported marriage with petitioner in good faith and therefore was not a putative wife," and (3) that "the fraud and bad faith, so found by the court, on the part of the respondent in securing her divorce * * * was, from its inception, a continuing fraud so as to deprive respondent from enjoying any of her rights as a party to the joint venture and from sharing in the increment flowing therefrom."

The respondent does not seriously argue that the specification as to the first two alleged errors has merit and apparently rests the efficacy of her appeal solely on the specification as to the third alleged error, which questions the continuous nature and effect of her fraud

rather than its existence. The nature of that fraud, therefore, will be considered at this time as well as its existence. That such fraud was of a continuing nature is evident from the wide scope of its operation in voiding *ab initio* not only the purported divorce between the respondent and her husband and the purported marriage between herself and the petitioner but her pending divorce action against the petitioner, including an order requiring him to pay her $100 per week as temporary alimony *pendente lite*. It is thus coextensive with her dealings with the court in the prior and pending divorce proceedings as well as with the petitioner in the intervening marriage ceremony and resultant relationship. The facts reveal that one or more related parts of her fraud progressively constitute the very foundation of each of those events in orderly sequence.

Within three months of her arrival in the Territory the respondent (domiciled as she was in California with actual knowledge of the territorial law of domicil as to its jurisdictional requirement that an applicant for a divorce must have resided in the Territory for at least two years next preceding his application) filed in a circuit court of the Territory a libel for divorce against her husband in California falsely alleging that she had resided in the Territory for more than two years, and at an uncontested hearing of that libel procured a divorce on her sole testimony in which she presumably prejured herself as to the material facts of her domicil. She patently was in haste to achieve the immediate objective of a divorce from her husband so as to be in a position to achieve the ultimate objective of marriage to the petitioner as soon as possible. Her fraud accelerated and made possible the achievement of both objectives, the purported marriage occurring within three days of the entry of the divorce decree. Thus

divorce was but a necessary step to marriage and both are within the ambit of the fraud as parts of the same transaction. In a comparable case Mr. Justice Hammond, speaking for the court in *Batty* v. *Greene,* 206 Mass. 561, 565, 92 N. E. 715, 717, aptly said: "While it is true that at the time of the fraud no property passed to the offending party, still the fraud consisted not alone of one single act, but of a continuous series of acts or rather of a continuous situation. Day by day and hour by hour did this woman, by maintaining in appearance her relation of a lawful wife, renew and repeat this fraud." That language is adopted by this court as its own to depict the continuous situation existing when the respondent purportedly married the petitioner and lived with him as though she were his legal wife.

In specifying the third alleged error, the respondent charges prejudicial error to an alleged finding of the chancellor relative to the operative effect which the respondent's fraud had in particular upon "her rights as a party to the joint venture," as set forth in the specification. That charge, however, is predicated upon an assumption that the chancellor properly drew from the evidence a preliminary conclusion or observation that "a joint venture did exist" during the quasi-marital relationship between the parties. That conclusion was orally made by the chancellor during the course of the extended trial and later incorporated into the written decision as a part of its thirty-five pages. If the assumption be correct so would the conclusion and the specification would then present a judicable question for appellate consideration; otherwise not. Thus the sufficiency of the specification to allege a reviewable error depends in the first instance upon the correctness of the assumption. The difficulty of test, however, is that the chancellor in making his conclusion

made no finding of fact or law to support it. In the absence thereof, this court must make its own findings in order to determine whether there is any evidence from which the chancellor might properly have drawn his conclusion. In doing so, it will view the evidence most favorably to the respondent independently of her fraud to the same extent as would be the case had she perpetrated no fraud and was the lawful wife of the petitioner.

The respondent claims in substance that, immediately after the parties married, a joint venture or business partnership arose between them and that the purpose of that common enterprise was to engage in and to share equally in the then sole business of the petitioner on the understanding that she would contribute her services, outside of her domestic duties, from time to time and that he would continue to contribute his services, as well as the capital, including the business itself and all its assets. She concedes that there was no express agreement of that character but contends that there was an implied one.

A joint venture must have its origin in contract and it can exist only by the voluntary agreement of the parties. It is not a status created or imposed by law, as urged by the respondent, but a relation voluntarily assumed and arising wholly *ex contractu*. As between the parties themselves whether they have created the relation of joint venture depends upon their actual intention which is determined in accordance with the ordinary rules governing the interpretation and construction of contracts. To do this the essential terms of a contract must be established with reasonable certainty. (See *Macfadden* v. *Macfadden,* 13 N. Y. S. [2d] 12, *aff'd* 13 N. Y. S. [2d] 17.) The contract, however, need not be formally expressed but may be implied in whole or in part from the acts and conduct of the parties or from the construction which the

parties have given to the contract between them. As a general rule, in order to constitute a joint venture, it is necessary that the parties agree to share losses as well as profits. Being closely akin to a partnership, the general rules governing the creation and existence of partnerships ordinarily apply. Nevertheless, the acts and circumstances occurring between husband and wife do not have the significance relative to the establishment of a joint venture or business partnership, which they would have if they occurred between strangers. (See *Jenkins* v. *Reichert,* 125 Conn. 258, 5 A. [2d] 6.) Thus the mere fact that a wife devoted some indefinite part of her time to helping her husband conduct a merchandise business would not make her his business partner. (See *Brecker* v. *Brecker,* 122 W. Va. 120, 8 S. E. [2d] 522.) With these principles in mind it is necessary to look at the particular facts and circumstances of the case to ascertain whether they would warrant a legal implication that the parties entered into a contract or agreement of joint venture or business partnership.

When the parties married, the petitioner was a man of modest means engaged in the popcorn vending-machine business as its sole proprietor. The respondent was without means and destitute. She obviously was not in a position to contribute capital and share business losses. After the marriage ceremony he provided her with a servant and proper maintenance and support under the honest belief that she was his legal wife. She at all times thereafter acted as though she was such a wife. In doing so she helped in the business—an easily managed one requiring little effort to run. There was no definite arrangement, however, as to when or how she should help or what her duties might be. Ordinarily, she helped when he was absent and then only in a minor role. Her services

were sporadic. They were neither special nor unique but commonplace and routine which she performed without expectation of a money consideration. Admittedly, to the extent that they were essential, he would have performed them himself or could have readily made other arrangements had she not voluntarily done them. There is every indication that he regarded her assistance as nothing more than that which a man would ordinarily expect of his wife. No terms of contract were discussed by the parties and none established with any degree of certainty. Nor did the respondent share in the profits or promise to share in whatever losses there might be. Consistent therewith the business at all times stood in his name and was recognized by all concerned to be his business. On scrutinizing the record this court finds nothing in her or his conduct during the period of over ten years, as shown by their testimony, which would indicate that she was his joint adventurer or business partner. In short, the evidence is insufficient as a matter of law to prove the existence of a joint venture or business partnership between the parties, as she claims and had the burden of establishing. The assumption of the respondent as to the correctness of the bare conclusion of the chancellor to the contrary is thus erroneous.

A case in point in this jurisdiction is that of *Ah Leong* v. *Ah Leong,* 29 Haw. 770, wherein this court likewise determined a similar claim upon comparable facts. In that case a man and woman lived together as husband and wife for almost forty years under a mutual innocent mistake of fact as to the validity of a marriage ceremony made in accordance with Chinese custom. She performed all the duties of a diligent wife, bearing children, doing the housework and helping out in his store. Her surname appeared in the name under which the business of the

store was conducted. Moreover, he had said to her "the business belongs to us." Those facts, she claimed, proved an agreement to share in the fruits of that business as the first of two alternative theories of recovery when she sued him in equity after discovery of the mutual mistake of fact concerning the validity of their marriage. But the court of equity held them to be insufficient to prove such an agreement. On appeal this court held to the same effect and said: "There certainly can be no legal implication from these facts of an agreement between herself and the respondent that they were to share in the assets and accumulations of the business that was conducted. Such implication is no stronger than if she had been the lawful wife of the respondent." (*Ah Leong* v. *Ah Leong,* 29 Haw. 770, 774. As to services of a lawful wife see *Dorsett* v. *Dorsett,* 183 N. C. 354, 111 S. E. 541.) That authoritative holding was not questioned or disturbed on further appeal when the court of appeals properly held the claimant to be entitled to a measure of relief as an innocent putative wife on her second theory of recovery. (See *Fung Dai Kim Ah Leong* v. *Lau Ah Leong,* 27 F. [2d] 582.) Under the rule of *stare decisis,* such final holding by this court upon the insufficiency of certain facts to prove a business partnership is determinative of the respondent's case upon comparable facts. The specification as to the third and last alleged error is therefore without merit.

In thus disposing of the respondent's sound but unestablished legal defense of joint venture or business partnership, this court is not unmindful of the respondent's insistence that she is entitled to some measure of relief growing out of the quasi-marital relationship between the parties on the analogy of a quasi-partnership. In short, she attempts to bring herself within the second theory which the claimant in the *Ah Leong* case advanced

and which was ultimately sustained by the court of appeals. To support her plea to that effect, she cites a great array of cases wherein courts of equity have accorded an innocent putative wife a share in property accumulated by the joint efforts of herself and the man with whom she has lived as his wife in the belief that she is such when legally she is not. Those cases deal with equitable relief as applied to a woman who in good faith entered into a marriage and later discovers it to be invalid for some reason of which she is blameless. The reason for the rule as laid down therein, however, does not apply to a case of a woman who, because of her knowledge of the illicit relation or because she has no sound or reasonable basis for believing otherwise, occupies the position of an adulteress and a breaker of the laws. In correlation, the facts of the cases relied upon by the respondent have no resemblance to the facts of her case, wherein she, as a married woman, in a pyramiding transaction committed perjury, procured a void divorce from her husband, entered into a void marriage with another man and after cohabiting with that man was in the process of procuring a void divorce and decretal award of alimony from him when he discovered her fraud and equity enjoined her. Obviously, the crux of the respondent's grievance is the discovery of her fraud or the resultant interruption of her enjoyment of marital rights, to which she is not entitled, rather than a denial of fundamental justice. She at no time had cause to initiate proceedings in equity as an innocent putative wife or to invoke the equitable considerations applicable to such a wife. This is true because she is not the defrauded party. On the contrary, she is the offending party whose own fraud gave rise to and contaminates the relationship upon which her plea is founded, and from which equity grants relief against her rather than in her favor.

(See *Batty* v. *Greene,* 206 Mass. 561, 92 N. E. 715; *Smith* v. *Foto,* 280 N. W. 790; *Butler* v. *Butler,* 157 N. Y. S. 188.) Consequently, the chancellor in this case properly denied the respondent's plea as one without foundation cognizable in equity on the doctrine of unclean hands.

Nevertheless, this is an appeal in equity where the whole case is open for examination beyond the narrow scope of the respondent's specification of the three alleged errors on which she relies. In reviewing the record as a whole this court is not satisfied that the decree is in full accordance with justice. It finds a fundamental error which is apparent on the face of the record and necessarily affects the decree. That error is that the court of equity, in granting relief by the exercise of extraordinary power to reform deeds so as to eliminate the respondent therefrom as a grantee, did not require the petitioner, who was seeking equity, to do equity as a term or condition for the relief sought. The obvious equity to be done in this case is to pay the fair and reasonable value of the respondent's services which were essential to the petitioner's business and performed outside the relationship contaminated by her fraud. Common decency dictates that he pay for the benefit of those services, as he would have had to pay a stranger who helped him to the same extent. A court of equity should require no less of the petitioner who seeks its aid. It should do so not as a matter of right in the respondent but as a requisite of fair play demanded of the petitioner. The problem, therefore, is not one of fixing a precise amount or proportionate share to which she is entitled but in arriving at a sum of money which, when paid to her, will be equitable and just on his part. This court is in a better position to solve that problem on appeal than would be the chancellor on remand, this court having reviewed the record and that chancellor not being

in the position of the chancellor who saw and heard the witnesses. From all the facts and circumstances, this court deems that $5000 is the fair and reasonable value of the respondent's services under consideration and is of the opinion that the payment of that sum to her would fully meet the ends of justice and correct the plain error on the record.

The petitioner's appeal challenges as error the decree in so far as it orders him to pay the respondent $2500 for her attorney. The theory on which the chancellor rested that decretal award, and on which the respondent urges this court to affirm such an award, is that the litigation instituted by the petitioner constitutes a matrimonial action of an equitable nature. But this court has already rejected that particular theory in this case and sustained the petitioner's thesis that "the respondent's admission that her purported divorce and marriage * * * were void *ab initio* robbed the litigation of its matrimonial character." It did so in *Kienitz* v. *Sager, A. K. A. Kienitz,* 38 Haw. 647, when it denied the respondent's motion that the petitioner be further ordered to pay her an additional sum of $10,000 for her attorney to prosecute her instant appeal. This court, on page 654, *supra,* adopted with approval the general rule as set forth in 35 American Jurisprudence, pages 225, 226, section 70, that "a wife is entitled to alimony, counsel fees and suit money, pendente lite, in a suit instituted by her husband for annulment of their marriage on grounds the existence of which she denies under oath, but such allowance will be denied her where it is clear at the time of her application from the pleadings in the case, her admissions, or otherwise, that there never was any marriage between them or that any marriage between them was void ab initio, as where she had another spouse living at the time the marriage was contracted

between them * * *." The rationale of that rule applies to the time of her prior application for allowance of attorney's fee before the chancellor with equal force as it does to that of her subsequent application before this court. For the reasons assigned in denying that subsequent application, the specification of alleged error to the granting of the prior application is sustained.

The decree, in so far as it grants relief to the petitioner, is affirmed. That part which orders him to pay the respondent $2500 for her attorney is reversed. The cause is remanded with instructions to modify the decree consistently with this opinion so as to not only delete that part ordering the petitioner to pay for the respondent's attorney but to add a new part imposing upon the petitioner, in granting him relief, a condition which requires him to pay the respondent $5000 for helping in his business on the terms that a lien in that amount shall be on the real estate involved in his suit for reformation until he so pays and meets the condition.

*R. G. Hogan* (also on the briefs) for respondent-appellant Peggy Rogers Sager.

*D. G. Ridley* (*J. A. Leavey* with him on the briefs) for petitioner-appellee William Frederick Kienitz.

CONCURRING OPINION OF CIRCUIT JUDGE MURAKAMI.

In joining in the opinion of the court I wish to set forth my reasons in amplification thereof and take this means for doing so. In my opinion there is not sufficient evidence in the record to show that the petitioner had knowingly participated in the fraud which had been perpetrated upon the court in the *Sager* v. *Sager* divorce proceedings. Had there been evidence to indicate that, in addition to giving her money with which to pay her attorney's fees, the petitioner had been actively involved

in the securing of the fraudulent *Sager* divorce decree in question, the parties would have been in pari delicto and the petitioner would have had no standing in equity.

However, this is a case of a married woman who had secured a divorce decree by her own fraud and perjury and who succeeded in entering into the pseudo-marital relationship with the petitioner. The law appears to be rather harsh in dealing with the offending spouse in such a case because she is entitled to neither alimony nor allowance upon the dissolution of the unholy alliance; and only where there is proof of a contract of joint venture is the offending putative spouse permitted to receive any property or a share of the profits from the jointly operated business.

Here it is contended that the evidence indicated the existence of a joint venture contract. But in the *Ah Leong* case (*Ah Leong* v. *Ah Leong*, 29 Haw. 776; 27 F. [2d] 582), which was a much stronger case for the woman, the court found that no joint venture contract, express or implied, existed. The record below fails to disclose evidence of the existence of any such contract. What little and sketchy evidence there was consisted of testimony tending to prove that the respondent occasionally did work in the business, which admittedly was owned and operated by the petitioner as a sole proprietorship. There was no evidence whatsoever which by inference, or otherwise, tended to prove that a contract or agreement for a joint enterprise existed between the parties or that either of the parties had ever considered that the business was jointly owned by both petitioner and the respondent at any time during the continuance of the pseudo-marital relationship.

The respondent's contention is that the chancellor made a finding of fact that a joint venture existed. My

view is that the final decree of the chancellor is effective notwithstanding his preliminary conclusion to the contrary. Moreover, as already indicated, I am of the opinion that evidence in the record which tends to show that occasionally the respondent assisted in the operation of the petitioner's business was wholly insufficient as a matter of law to substantiate the respondent's claim that there is sufficient evidence of the existence of a contract of joint venture. The conclusion reached by the chancellor as embodied in the decree to the effect that no joint venture existed was amply sustained by the evidence, their being no showing of facts or circumstances from which the existence of a contract of joint venture might be inferred or implied.

The respondent relies upon the *Ah Leong* case for some measure of relief. In that case relief was given to the innocent spouse upon the humane theory that to deny relief to an innocent woman under the circumstances would amount to a denial of fundamental justice and equity. Where the woman is the offending party, as in this case, there is no good reason or logic for extending that principle of natural or fundamental justice enunciated by the ninth circuit court of appeals in the *Ah Leong* case, *supra*.

However, there is no dispute as to the fact that aside from domestic duties, the respondent performed actual services in connection with the petitioner's business enterprise for a period of ten years, for which no compensation as such has been paid to her. Inasmuch as the petitioner is seeking affirmative relief in equity to reform the deeds to real property held in the joint names of the parties, it is but plain equity to require of him to do equity by paying the respondent the fair and reasonable value of such services as a condition to the granting of such relief.

OPINION OF STAINBACK, J.
(Concurring in Part and Dissenting in Part.)

While I agree that the decree of the chancellor should be reversed, I disagree with the reasons therefor. I disagree with the conclusion that the deeds should be reformed and disagree that the compensation of the respondent should be fixed by this court rather than be returned to the court below which could take evidence to find a proper basis in case a money award should be made to the respondent in addition to her share of the property already deeded to her. I also agree that the marriage of petitioner and respondent was void *ab initio.*

Without going into too great detail of the facts, it appeared that the respondent, then a married woman, came to Hawaii on a visit in June, 1938. Soon after her arrival she met the petitioner, who had arrived here some six months earlier, having left Montana mainly because of the condition of his health. The petitioner paid ardent court to respondent whom he knew was a married woman. He proposed marriage to her, suggesting that she get a divorce and thereafter marry him though he knew she had been in the Territory only a few weeks. When she replied that she did not have money for a divorce, he offered to finance it. Respondent was told by certain women that she would have to reside within the Territory for a two-year period before obtaining a divorce but if she went to the right attorney she would not have to wait that long. She did go to an attorney, filed in September, 1938, a suit for divorce *financed by the petitioner,* and obtained a decree of divorce in November, 1938, for which petitioner paid all costs and fees, paying part before the decree and part after.

It does not appear what evidence relating to residence requirements was given by respondent in her divorce proceeding, as the transcript of the proceedings has disap-

peared, the presiding judge has been dead for some years, and the attorney who handled the case no longer resides in the Territory. However, as the libel for divorce was verified, it may be safely assumed that fraud was committed upon the presiding judge in some manner.

In the meantime petitioner, who had established a small popcorn business in Hawaii, had gone back to Montana; as planned, he returned to Hawaii on the date respondent received her divorce, obtained a waiver of the three-day delay and married respondent on the day after his return. They thereafter lived together as husband and wife, apparently happily married, for more than ten years, as shown by petitioner's letters up to late 1948.

Not only did petitioner prosper during the ten-year period succeeding his marriage to respondent, but his health greatly improved. In June 1938 he was badly run down and in a nervous condition, being of a subnormal weight of 185 pounds, but regained his normal weight of 230 pounds during the period while he lived with respondent.

Respondent aided and assisted petitioner in the popcorn business in Hawaii, particularly during the war years when the business was carried on from their residence, and the same grew to be very prosperous. (Figures are not available as to profits, but in one year the gross receipts from the popcorn business were some $98,000.)

Respondent, in addition to keeping house, aided petitioner in his business by collecting accounts, delivering popcorn to the various spots, making deposits, and when petitioner was absent on the mainland having general charge of the business with power of attorney. On one occasion she even mortgaged lands to secure release from an attachment which had been levied upon the business property. As showing the affectionate relationship be-

tween the parties and the fact that Mrs. Kienitz did aid the petitioner and was in charge of the business while her husband was away, I merely quote one of his several letters, dated March 17, 1948, as follows: "Well, how is my Peg. I hope she is ok. And how is business? Are all vending machines out, and are all big machines been shifted to the other Islands. — I hope you are not too lonesome dear — I love you. Big hug and kiss." During this period petitioner purchased three parcels of land, placing them in their joint names as tenants by the entirety, and certain improvements were erected thereon: on one lot a home, and on another improvements to be used in connection with the popcorn business.

Difficulties arose between the parties early in 1949 and the respondent herein instituted a suit for divorce in this circuit alleging mental cruelty on the part of the petitioner. Thereafter petitioner started the present proceeding alleging that the divorce of respondent from Mr. Sager was void, that her purported marriage to himself was void, that the conveyances of property to them as man and wife were due to her fraud, and prayed that the deeds be reformed to make him the sole grantee, and that the marriage to him be declared null and void.

Upon the hearing of this equity proceeding, the chancellor found that the marriage of petitioner and respondent was void because respondent's divorce from her first husband was void; that the respondent was engaged in a joint venture with the petitioner, and that though she contributed no capital she did aid and assist him in his business over and above mere wifely duties; and that "The parties * * * both having formerly lived on the mainland, and later coming to the Territory, the Court will not and cannot judicially note, or charge * * * these two parties to this proceeding, with knowledge of the law." He then

concluded that it would be an "impossibility * * * that this respondent would not know of the two-year residential requirement at the time of seeking the divorce in 1938. * * * and at all times since then, this respondent was and continues to stand charged with the knowledge [namely, two-years residential requirement to secure a divorce];" that petitioner did not discuss and did not know the two-years residential requirement for divorce; further, that the deeds be reformed to make petitioner the sole grantee and that the respondent, not being "a putative wife in good faith," was entitled to no relief.

That there was no fraudulent misrepresentation by respondent that induced petitioner to marry her is clear.

In the first place the rule in equity, as well as in law, is that to be actionable fraud must be a misrepresentation of a fact known to be false, made to induce the other party to act and *relied upon by the other party* who is ignorant of the true facts and who does act to his detriment. A misrepresentation of law is not considered a fraudulent misrepresentation (except under certain circumstances not pertinent to this case) because not only is it said that all persons are presumed to know the law but, further, such a statement would be merely an expression of an opinion other than the assertion of a fact. (3 Pomeroy, *Equity Jurisprudence,* § 877-a [5th ed., Symons], citing cases from the United States Supreme and Federal Courts and most of the States.)

In 23 American Jurisprudence, Fraud and Deceit, section 45, page 809, the statement is made that "The general rule is well settled that fraud cannot be predicated upon misrepresentations of law or misrepresentations as to matters of law *based on facts known to both parties alike* * * * ." (Emphasis added.)

If petitioner did not know the facts relating to re-

spondent's divorce there might be a misrepresentation by the respondent, but he knew the length of residence of the respondent and the fact that the divorce was granted in Hawaii and he himself *aided and abetted* her to secure it. As he persuaded her and aided her to obtain the divorce for the purpose of marrying him, the least he could do was to see that her divorce was legal. (*Taylor* v. *Taylor* [Calif.], 152 P. [2d] 480.)

The petitioner, a subsequent husband, cannot *in equity* take advantage of a wife's fraud in securing a divorce *where he was either guilty of instigating, abetting or encouraging the divorce proceedings resulting in a void divorce from her first spouse or was grossly negligent in encouraging them.* At least he cannot obtain *affirmative* relief.

*Taylor* v. *Taylor,* 152 P. (2d) 480, is an interesting case where the facts and the relief sought are very similar to the case before us (except, perhaps, the husband in addition to instigating and encouraging the divorce advised the wife that such a Mexican divorce was legal.)

In the *Taylor* case, as in the present case, the husband contended that his marriage to respondent should be annulled because the wife had a living husband at the time of her marriage to him and, as in the instant case, he sought *affirmative* relief in the form of the cancellation of a deed whereby he had vested his two properties in the wife and himself as joint tenants. He claimed, first, that the deed to the wife was obtained through fraud; second, that it was made under mistaken belief that plaintiff was his legal wife; and, third, that there was no consideration for such deed.

Prior to the union of this couple the wife had been the wife of another man but was living separate and apart from him. She met the petitioner, they developed a mu-

tual fondness, and she announced her intention of obtaining a divorce in Nevada. Petitioner suggested that she obtain a Mexican divorce as it would be cheaper and more expeditious; she did so *with funds supplied her by the petitioner* and immediately thereafter the two were married. They continued the marriage relation, she performed the customary services as housekeeper for some two years, and left him on account of cruelties and later filed suit for divorce. In the meantime, during their married life, the husband had his attorney prepare a conveyance vesting his two properties in himself and his wife as joint tenants. At that time both naturally assumed that the Mexican divorce was valid and their marriage lawful.

The trial court decided that in procuring the deed there was no fraud, there was no mistake, and that there was ample consideration for the deed and refused to set it aside, but did declare their marriage null and void as the Mexican court was without jurisdiction in the divorce proceeding.

The appellate court sustained the action of the trial judge saying that the services rendered a man by the woman while they lived together and her sufferance of his cruelties were a consideration for the conveyance if such were needed. But the court said no consideration was needed as the transaction amounted to a gift from the man to the woman motivated by nothing more than a desire to share his property with another at a time when he *was in possession of all the facts*. The court further found there was no fraud in obtaining the deed nor evidence of undue influence; that the husband was not defrauded by respondent marrying him while she had an undivorced living husband, in this regard finding that *the husband actively aided the plaintiff and was equally culpable with her in embarking upon the marriage without investigating*

*the legality of the Mexican divorce.* "His honest belief in the legality of the Mexican decree does not obviate his responsibility for *encouraging* its procurement." (Emphasis added.)

The court further found that "Where the parties to a putative marriage have accumulated no community estate, upon an annulment of the invalid marriage it is proper to award the de facto wife a money judgment for her services. 'The law raises the promise to pay in such cases.' Sanguinetti v. Sanguinetti, 9 Cal. 2d 95, 69 P. 2d 845, 848, 114 A. L. R. 342."

A voluntary gift divests the donor of his property and invests the donee with an irrevocable title. If there was neither actual fraud nor undue influence on the respondent obtaining a joint interest in the appellant's property, her title thereto is secure either because the conveyance was made out of consideration of services as a wife or because it was a voluntary gift. In either view, respondent is secure in her holding. (*Taylor* v. *Taylor, supra.*)

The court in the *Taylor* case said that the proceeding was not primarily to determine the financial or material obligations that one owed to the other; it was *a denial of relief for equitable reasons* because the demand to cancel the deed "lacked equity." The court stated: "*Whether appellant was guilty of instigating the Mexican proceedings or was grossly negligent in encouraging them, he was no less culpable than respondent in contracting the void marriage. Under the clean hands maxim he may ask nothing of equity save that specifically authorized by statute, towit, an annulment.*" (Emphasis added.)

Additional cases refusing relief to a second husband who is guilty either of instigating or aiding a wife to obtain a divorce from her first husband where such divorce turns out to be illegal or void are numerous. The follow-

ing are a few of them from various jurisdictions.

*Kaufman* v. *Kaufman,* 163 N. Y. Supp. 566, held that where a wife, at the request of plaintiff, who financed her, obtained a divorce in Nevada and subsequently married plaintiff, the divorce will be conclusively presumed to be valid in an action by plaintiff to annul his marriage. After pointing out that it was against the public policy of New York to recognize such a decree, it refused plaintiff relief saying: "If she would not be heard to question the validity of the divorce, and could not have her marriage with plaintiff annulled on the ground that the divorce was invalid, why should he, *who induced her to obtain it, and then to marry him* on the assumption that she was free so to do, be heard to question its validity?" (Emphasis added.)

To a similar effect is the case of *Margulies* v. *Margulies* (New Jersey), 157 Atl. 676, wherein it is stated in the syllabus: "Husband having *induced* wife to obtain foreign divorce from first husband *and paid expenses held* precluded from attacking validity of divorce." Again, "Husband, having participated in fraud by which wife obtained divorce from first husband, cannot *in equity* take advantage of wrongdoing." (Emphasis added.) In addition, the court held that after the wife became eligible to marry and the parties continued to live together there was a common-law marriage.

*Van Slyke* v. *Van Slyke,* 152 N. W. 921, held a divorce secured by fraudulent representations as to residence of complainant cannot be set aside at the suit of one who subsequently married complainant where he himself was a party to the fraud in obtaining the former decree. In that case the court pointed out that the second husband was quite as much interested in procuring the decree of divorce as was the complainant, he *"proposed to pay her counsel* and advised her and her counsel of his interest.

He intended to profit by the decree of divorce, not in a financial way, but in removing an obstacle to his marriage with complainant. *Whether it was or was not intentional, he aided and abetted the fraud* which was perpetrated. * * * Upon the authority of Robson v. Robson, 161 Mich. 293, 126 N. W. 216, he may be held to have no standing to present the defense that he was defrauded into marrying complainant." (Emphasis added.)

*Robson* v. *Robson,* 161 Mich. 293, 126 N. W. 216, held that a man who interested himself in and promoted the suit of a woman against her husband for divorce, intending to marry her after she had procured a divorce, could not after he had married her maintain a suit to set aside the divorce on the ground that she obtained it *through a fraud* on the court *which consciously or unintentionally he aided or abetted her in perpetrating.*

In *Hall* v. *Hall,* 123 N. Y. Supp. 1056, it was held that the second husband was not injuriously affected by virtue of the wife's fraudulent divorce but, to the contrary, he obtained what he wanted; that while the divorce was voidable it was not void nor could she avoid it though the former husband, if living, might have.

*Kinnier* v. *Kinnier,* 45 N. Y. 535, held that the second husband could not attack a divorce where the original was obtained by collusion and fraud. The decision pointed out that the Illinois courts having jurisdiction, there could be no collateral attack. "Conceding fraud, as alleged, he cannot avail himself of it."

See also: *Bater* v. *Bater* (Eng.), 5 B. R. C. 717; *Atkinson* v. *Atkinson,* 65 App. D. C. 241, 82 F. (2d) 847; *Rocco* v. *Rocco,* 288 N. Y. Supp. 405.

The above list is not exhaustive. There are many more cases to the same effect. In fact I have been unable to find a single case that does not deny affirmative relief to a

second husband who aids and abets or encourages the wife to secure a divorce from her first husband for the purpose of marrying him when such divorce turns out to be void or voidable. In refusing to listen to the husband the court does not aid in giving effect to a judgment obtained by fraud but regards the husband as a suitor without a cause of action.

No one of the cases cited in Mr. Justice Le Baron's opinion is contrary to the numerous cases holding that a second husband who is guilty either of instigating or aiding a wife to obtain a divorce will be refused affirmative relief where such divorce turns out to be illegal or void.

He has cited three cases, two to show respondent having received a fraudulent divorce has no equity against petitioner, the other a case of plain bigamy. The first case from which extensive quotation is made is the Massachusetts case of *Batty* v. *Greene,* 206 Mass. 561, 92 N. E. 715, and involves a suit against the estate of a deceased wife on the ground that the marriage was void because of a concealment of a prior marriage, which marriage had never been dissolved by death or divorce. It seems that one Elizabeth Mitchinson, before she had gone through the marriage ceremony with Batty, had gone through a marriage ceremony with Mitchinson with whom she had lived for nineteen years as his wife until his death, which occurred before the marriage ceremony between herself and Batty. Later, however, it appeared that before either of these ceremonies she had married in England one Fotherby who did not die until April 1902, and it appears that Batty knew nothing of this marriage until after 1898 and before Elizabeth Mitchinson's death in 1902. From the time of his marriage Batty put his money into a common fund with his wife's, which was used for the purpose of both, and certain houses were purchased after the

marriage with money from this common fund, which property was put in the name of the wife. The master found that Batty contributed at least six fifteenths to the common fund and that he was entitled to this as being his full proportion thereof. In this case the plaintiff knew nothing of the prior husband from whom there had not even been a pretended divorce. The decree giving the plaintiff six fifteenths of the property was affirmed. Clearly that case involved no fraudulent or void divorce *secured by plaintiff's aid.*

Another case, *Smith* v. *Foto,* cited and quoted in the justice's opinion, can best be described in a later Michigan case of *Zirkalos* v. *Zirkalos,* 326 Mich. 420, 40 N. W. (2d) 313, 314, wherein it cites the Foto case again on appeal to the Michigan supreme court (*Bankers Trust Co. of Detroit* v. *Foto,* 4 N. W. [2d] 54), which stated that in the prior case (*Smith* v. *Foto*) no law was made as only four members of the court concurred in the reasons given in the opinion that was submitted and that "all that was decided was that the bill contained allegations conferring jurisdiction and commanding the taking of proofs." It is interesting to note that in the last *Foto* case after taking proofs the circuit court dismissed plaintiff's bill finding that the plaintiff's collateral attack upon the divorce could not be sustained when it was contended that the court had no jurisdiction because of irregularities of service of summons. This finding was sustained on appeal in the case of *Bankers Trust Co. of Detroit* v. *Foto, supra,* so that if the case cited in the justice's opinion stood for any law, this was overruled by the holding in the second appeal (evidently overlooked by the justice). So, too, the *Zirkalos* case quotes with approval many Michigan cases, particularly *Van Slyke* v. *Van Slyke, supra,* as to the power of a court of equity to set aside its own decree of

divorce for fraud in its procurement or for want of jurisdiction on the application of the party against whom the decree was obtained, but that the decree cannot be voided by the party guilty of the fraud nor at the instance of third parties. It quotes with approval cases from other jurisdictions, particularly New York, holding that one aiding and abetting or participating in a fraudulent divorce cannot question the same. Furthermore, the allegation in the *Smith* v. *Foto* case was that plaintiff met the defendant and "she informed him she had been married to a man named Frank Foto but had obtained a divorce from him in Chicago in 1928." Had respondent in the instant case informed petitioner when she met him that she had been married but had obtained a divorce in California, it would have some similarity; but in the instant case, as previously pointed out, the petitioner actually encouraged and financed the divorce proceedings of respondent.

The third case, *Butler* v. *Butler*, 157 N. Y. 188, cited in the justice's opinion, was a case where a woman met the plaintiff and thereafter "She [falsely] told plaintiff that she had been married, but that her husband had been absent continuously for five years, that she did not know where he was and whether or not he was alive, and that she had tried to locate him, but had been unable so to do." Plaintiff proposed marriage. Apparently, under the New York statute where a husband has been absent for five years and cannot be located, a wife may make an affidavit to this effect, act upon the presumption of his death, and secure a license to remarry. She did make such an affidavit and married plaintiff, who obviously knew nothing of the facts. Here is a direct fraud upon the plaintiff himself by a false representation, known to the wife to be false, made to the plaintiff with intent that the

plaintiff act upon it, who was ignorant of the facts and did act upon the representation to his detriment. This is quite different from the present case where there was no false representation, or any representation whatever, made to the petitioner save that she was a married woman who had been here only a few weeks.

In addition to the New York cases heretofore cited, there are numerous other New York cases that equitable defenses will operate in an action to annul a void marriage and the most common equitable defense is the doctrine that he who seeks equitable relief must come into court with clean hands.

Supplementing the type of cases denying a husband relief because of lack of equity are the numerous cases which give a *de facto* wife a share of the property accumulated by the husband and such *de facto* wife, frequently based on the theory of a "joint venture," and in those cases, where no property has been accumulated, the court gives to the *de facto* wife a money judgment usually on the theory of "quasi contract." In the latter cases the supposed husband has been unjustly enriched by the wife's services.

The opinion of Mr. Justice Le Baron (as well as the chancellor's) that the respondent practiced *fraud upon the petitioner* confuses *fraud upon the court* with fraud upon the petitioner. His opinion states: "One phase of that fraud is her false representation that she was domiciled in the Territory at the time of her purported divorce." (No representation was made to petitioner and none could be made, as he actually knew the facts to the contrary.) "Another is her false representation that she was legally divorced and free to marry at the time of her purported marriage." Had she obtained her divorce outside of the Territory, with the petitioner having no knowl-

edge of the actual facts, a representation that her divorce was legal would have some status, but certainly not with petitioner knowing all the facts. "Still another is her false representation that on such marriage *she became legally married* to the petitioner and thereafter was entitled to be treated by him as his legal wife." (Emphasis added.) Such reasoning needs no comment.

There is not a scintilla of evidence that the respondent made any representations to petitioner regarding the legality of their marriage, concerning which both parties knew all the facts relative thereto; both knew that respondent had been in the Territory only a few months; petitioner himself had been here more than six months longer than respondent; both had *notice* of the inadequate residence of respondent and consequent illegality of the divorce and doubtless were chargeable with notice of all the legal consequences flowing therefrom, including the illegality of the marriage, though neither had *actual knowledge* of the illegality of the remarriage. *The sworn answer of respondent and the undisputed testimony show that both regard the marriage as legal until after the institution of the divorce proceedings in 1949 by respondent.* Many divorces are obtained by collusion and fraudulent testimony (particularly in States that have only one cause for divorce) yet a marriage entered into thereafter by the divorced spouse is perfectly good until set aside by proper parties unless the fraud goes to the jurisdiction of the court granting the divorce (*Ruger* v. *Heckel,* 85 N. Y. 483; *Deyette* v. *Deyette,* 92 Vt. 305; *Kinnier* v. *Kinnier, supra*), and a third party or one participating in the fraud cannot take advantage thereof.

From the opinion of Mr. Justice Le Baron it is difficult to understand his conclusions allowing respondent five thousand dollars, or any amout whatever. The opinion of

the justice rehashes the reasoning set forth in the opinion delivered by the territorial supreme court relative to "joint venture" in the *Ah Leong* case (which, denying the defendant's *de facto* wife any compensation, was reversed by the circuit court of appeals for the ninth circuit) and concludes that the parties were not engaged in a "joint venture," as had been specifically held by the chancellor below. His syllabus states: "Mere sporadic services of a wife in her husband's business, contributed outside her domestic duties, does not suffice to make her a commercial adventurer or business partner." And, on page eight of his opinion, the following occurs: "There is every indication that he [the husband] regarded her assistance as nothing more than that which a man *would ordinarily expect of his wife.*" (Emphasis added.)

The justice left unchanged in his final opinion, which I did not see until after the same had been filed, the *reasoning* in his original draft wherein he followed the decision of the territorial supreme court relating to "joint venture," found there was none, that respondent was doing no more than a man "would ordinarily expect of his wife," and allowed the respondent nothing; also, the conclusion that the respondent was entitled to no part of the property accumulated was retained in the final opinion, his syllabus reading as follows: "The reason for the rule in equity, allowing an innocent putative wife a share in property accumulated by the joint efforts of herself and the man with whom she has lived as his wife * * * has no application to a woman who * * * is not an innocent party but * * * by her own perjury and fraud invited the consequences of which she complains * * *."

In view of Mr. Justice Le Baron's conclusions regarding the services of the respondent being incidental to the duties of a wife and her lack of equitable claim to a share

in the property, it is difficult to see on what theory he makes an award to the respondent (unless as a compromise with conscience) and particularly how he arrives at the amount of five thousand dollars for her "services."

The fable of the bat as told by Aesop is applicable here. When caught by the cat, who is hungry for mice, he extends his wings and convinces the cat he is a bird; next, having been caught by an owl, who is hungry for bird, he points to his fur and convinces the owl he is not a bird but a mouse. Thus, when performing services in the business of the petitioner she is a wife, doing what a husband "would ordinarily expect of his wife" and is not entitled to compensation, but when performing wifely duties and seeking the rights attached thereto she is not a wife but merely a stranger.

The record does not contain evidence by which a proper amount to be awarded to the respondent can be determined.

The circuit court of appeals, in the *Ah Leong* case, after determining that the plaintiff was entitled to a measure of relief, pointed out that the decided cases are not in harmony as to what standard should be supplied in determining the amount and character thereof, and states that "perhaps no specific general rule can be formulated. Each case must be adjudged in the light of its own peculiar facts and the local laws." The court, however, said it would be proper in further proceedings to take into consideration the relative contributions of property and of personal services in point of value made by the two parties in the accumulation of property standing in the defendant's name, the amount and value of such property at the time their *de facto* marital relations ceased, the amount of property accumulated by plaintiff during the said period and standing in her name, the local statutes affecting the

marital relation and divorce, and alimony and dower, or other pecuniary interests of the wife, whether absolute or contingent, present or in expectancy. (*Fung Dai Kim Ah Leong* v. *Lau Ah Leong,* 27 F. [2d] 582.) These factors have not been placed in evidence in the present case to enable a court to make a proper determination.

The chancellor below found that there was a joint venture with the respondent contributing services and no cash. He might also have found that the respondent contributed cash, the evidence showing that she contributed between four and five thousand dollars, the amount of an accrued insurance policy which petitioner had previously assigned to respondent. It may be argued that this being a gift from the petitioner, it was actually his contribution. However, the petitioner had parted with complete title to the insurance policy and the respondent had collected the proceeds, was the legal owner thereof, and was under no obligation to give the same to petitioner or to invest it in their joint undertaking. These facts are uncontradicted. Thus, there is ample evidence to support the finding of the chancellor both as to services rendered and, in addition, capital contribution.

However, the chancellor, evidently because he found that the wife was chargeable with knowing the law relative to the two-year residence requirement for divorce (but that the petitioner, who had been in the Territory six months longer than the respondent, was not presumed to know the law) and that therefore her divorce was obtained by fraud, refused to allow the respondent any compensation for her services in the joint venture, which he specifically found existed.

As pointed out, no fraud was committed by respondent on the *petitioner,* but only upon the court for which both are chargeable. Both parties believed in the legality of

their marriage and the same would have been legal and not subject to attack save that the fraud went to the jurisdiction of the court granting the divorce. Nothing appears in the record which should prevent her from recovering either property or a money award to which she would be entitled were she entirely innocent of wrongdoing, unless the purpose of the chancellor was to punish the woman and not the equally guilty man for participating in the illegal relationship. There can be no question that her services as homemaker, as well as her services in the business, were of value to the petitioner.

Obviously both parties thought their marriage was legal as their conduct showed conclusively. What then are the respective rights of the parties, where both have legal notice of fraud upon the court but not actual knowledge of the invalidity of their subsequent marriage?

The overwhelming weight of authority, and particularly of modern cases, is that upon an annulment or a declaration of the invalidity of such a marriage, the courts will recognize the rights of a *de facto* wife in property acquired by the parties through their joint efforts and will make an equitable division of such property, or will recognize a right to recover for services by the *de facto* wife on the theory of a quasi contract. The supposed husband has been unjustly enriched by the reasonable value of the services rendered to him. The law raises a promise to pay in such a case, although there is a minority view where recovery to a *de facto* wife is denied on the grounds that she never contemplated that she should be paid for such services and a contract will not be implied. The leading case holding this view is *Cooper* v. *Cooper*, 147 Mass. 370, which has not been followed in other jurisdictions. Intent is not a necessary element in the equitable doctrine of quasi contracts. See *Balkan* v. *Buhl* (Minn.), 197 N. W.

266, that "The quasi contract is what was formerly known as the contract implied in law. It has no reference to the intentions or expressions of the parties. The obligation is imposed despite, and frequently in frustration of, their intention."

As showing the extent to which a court of equity will go in allowing compensation to a *de facto* spouse, even one guilty of fraud, who performed services adding to the value of the property of the other spouse, see the case of *Davis* v. *Cummins*, 195 S. W. 752. Davis, a married man posing as single, without a divorce from his first wife, married one Mary A. Staples. Davis, who had no property, acquired possession of his wife's property and through the value of his services in managing the business he afterwards bought other land. It was held that Davis' marriage was a fraud, that the fraud continued up until the date of her death, during which said period he induced her to believe, and she did believe, that he was her lawful husband, but the court dealing with the matter as a court of conscience held that the ends of justice would be promoted by treating the compensation earned by Davis in managing the affairs of his wife as a payment of the purchase money for a portion of the land and allowed him an interest therein. This case, it will be noted, was referred to by the chancellor in his opinion below but to illustrate the exact opposite of what the case actually decided.

To summarize, this court should hold:

That respondent's divorce having been granted by a court without jurisdiction is void *ab initio;* that the subsequent marriage is void and needs no annulment but there was no error in the court declaring such marriage void;

That the respondent in obtaining her divorce practiced

no fraud or misrepresentation upon the petitioner, who knew all the facts relative to her residence; and, furthermore, petitioner being guilty of instigating, aiding, abetting, encouraging and financing the divorce proceedings against respondent's first husband, in order that respondent might marry him, which proceedings resulted in a void divorce from respondent's first spouse, cannot take advantage of the wife's alleged fraud upon the court in securing the divorce as he was equally culpable with the respondent in entering into the subsequent marriage without investigating the legality of the divorce; and that under the doctrine of clean hands, petitioner may not ask anything of equity in the way of affirmative relief;

That the deeds giving respondent an interest in certain real property should not be modified; that the grantees under these deeds hold as tenants in common; that there was no misrepresentation or fraud by the respondent in securing the deeds, and that there was ample consideration therefor, and even without consideration the deeds would be good as gifts; furthermore, the court should refuse to listen to the petitioner, as he has not come into court with clean hands and must be regarded as a suitor without cause of action;

That the services of the *de facto* wife should be compensated but the amount and value should be determined by the court below after a hearing; that in fixing the value the court may take into consideration the value of the property accumulated during the marital period, the extent and value of the respondent's services, the value of the real property received by the respondent by way of gift from the putative husband and other matters that may be material to the issue.